**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | |
| | : | **Case Number: 19-cr-00281** |
| **ETHAN JARROD WOODARD** | : | |
| | : | **Detention Hearing: November 20, 2019** |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF**
**PRETRIAL DETENTION OF DEFENDANT ETHAN JARROD WOODARD**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in support of its request that defendant Ethan Jarrod Woodard be detained pending the trial of this matter pursuant to 18 U.S.C. § 3142(f)(1)(A), because the offense involves a crime of violence and because there is no condition or combination of conditions that will reasonably assure the safety of any person and the community. The defendant has been charged via Criminal Complaint with Distribution of Child Pornography, in violation of Title 18 United States Code Section 2252(a)(2). As detailed below, an analysis of the factors set forth in 18 U.S.C. § 3142 leads to the conclusion that detention is appropriate.

**FACTUAL BACKGROUND**

On Friday October 18, 2019, a Federal Bureau of Investigation Washington Field Office Task Force Officer ("FBI WFO TFO"; hereinafter referred to as UC) was acting in an undercover capacity as part of the Metropolitan Police Department-FBI ("MPD-FBI") Child Exploitation Task Force, operating out of a satellite office in Washington, D.C. In that capacity, the UC posted numerous online messages on a specific social media forum known to the UC as

an anonymous website where individuals discuss their sexual interest in children and trade child pornography. This site is a free online chat website that allows users to socialize with others without the need to register. The service randomly pairs users in one-on-one chat sessions where they can chat anonymously using the names "You" and "Stranger". Users type in search words and the site pairs them with random strangers who typed in the same search terms. In this investigation, the UC used the following search terms:  sister, girls, boys, dad, perv, mom, pre, kik, sex, dad, niece, and cheezepizza.[1] The site paired the UC with only those users who typed in the same search terms.

On October 18, 2019, the UC entered the website and sent a message to several users using the above listed search terms. The message read, "Incest dad at home with step son and daughter today (October 18, 2019.) Any other dads/family in similar situation? Or any others watching really yng today???" The UC provided a KIK screen name so that individuals reading the post could contact the UC using that platform.[2]   On October 18, 2019, at 11:25AM EST, a KIK user using the name "AphidEthan" and a display name of, "Salty Cornflake", later identified as ETHAN JARROD WOODARD (herein "WOODARD"), initiated contact with the UC on KIK. WOODARD wrote, "Hey from xxxxxx.com[3] you like incest and yng?" The UC responded to WOODARD's message and a conversation ensued.  During the course of the chat, WOODARD

---

[1] It is known to law enforcement that cheezepizza is code for child pornography.

[2] KIK is a freeware instant messaging mobile application where one can transmit and receive messages, photos, videos, sketches, mobile webpages, and other content.  Users can communicate privately with other users or in groups.

[3] The true name of this website is known to law enforcement.  It is being anonymized to protect ongoing investigations.

stated that he was an 18-year-old male residing in Maryland and attending college in Baltimore, Maryland.  The UC informed WOODARD that he resides in DC and that he has an 8-year-old daughter.  WOODARD stated, "Ive never done anything with someone in my family but I have mega links if you wanna trade".  The UC informed WOODARD that he was "looking for others that play," indicating that the UC wanted to chat with individuals who had sexual contact with children.  In response, WOODARD wrote, "I have just not in my family, but Ive played with some girls from the elementary school near my house" [4]  The UC requested that WOODARD take pictures of the local elementary school, to which WOODARD replied, "I can't I'm at college for now that's why I offered links."  WOODARD further explained, "Yeah all the personal stuff I have is hidden at my house."  As the chat ensued, WOODARD explained, "The way I got a girl into it was covering my dick in chocolate syrup lol." WOODARD wrote, "Worked really well actually especially when I almost got her to deep throat by saying using her tongue out of her mouth was cheating". WOODARD informed the UC that his child victim was 9 years old.

During the course of this chat, on October 18, 2019, WOODARD sent the UC two mega links.[5]  The first mega link ended in serial number REj4A and the second link ended in CPeMQ. Both links contained numerous videos depicting prepubescent children and teens being sexually abused. The fist mega link contained a folder titled, "Daughter Dad".  This folder contained

---

[4] The investigation has revealed that prior to residing on campus at the University of Maryland in Baltimore, WOODARD resided with his mother and siblings.

[5] Mega Link is a cloud storage and file hosting service offered by Mega Limited, an Auckland-based company. The service is offered primarily through web-based apps. Mega mobile apps are also available for Windows Phone, Android and iOS.

approximately 120 videos, some of which depicted prepubescent children engaging in oral sex with adult men. Other videos showed prepubescent children, fully nude, exposing their genitals. The second link contained hundreds of videos depicting prepubescent children and teens engaged in sexual acts with adult men. Legal process was sent to Mega Link. Both of these links belong to a user associated with the email address ebugwoodard@gmail.com. An open source search revealed a Skype account linked to this email address, as well as to the phone number WOODARD was using to communicate with the UC.

During the course of the chat, the UC informed WOODARD that he was sexually active with his purported 8-year-old daughter. WOODARD informed the UC that he was interested in meeting the UC's daughter and that he wanted to engage in sexual activity with the child. During the course of the chat, the UC sent images of his purported daughter to WOODARD.[6] The UC also provided his cellular phone number to WOODARD. As the chat continued, WOODARD asked the UC several questions regarding the logistics involved in arranging their meeting. WOODARD asked the UC if he would be able to pick him up, and he informed the UC that he did not have a car. WOODARD further inquired, "Would we have to drive all the way back to dc just to have fun with her because what amount of time would we have any way with all that driving?"

On October 18, 2019, the UC began communicating with WOODARD via text. During the course of the chat, WOODARD stated that his name was Ethan. WOODARD informed the UC that he was interested in the UC bringing his daughter to a motel near WOODARD's college campus in Baltimore. In fact, WOODARD texted the UC a link to a website that contained

---

[6] The images the UC sent to WOODARD did not depict a real child.

4

information about a motel that was inexpensive and close to the college campus. The link contained information about a Motel 6 near Baltimore, Maryland. The UC asked WOODARD what he wanted to do with his daughter, informing WOODARD that, "I do have some limits lol." WOODARD replied, "And I at least want to have her suck me off and lick her and maybe cum with the head of my cock poking into her pussy but no actual penetration". WOODARD wrote, "I also kinda wanna do the chocolate syrup thing again." WOODARD also asked the UC if they could watch "porn" with the 8-year-old child. Continuing the conversation, the UC asked if WOODARD had any "homemade pics?," referring to pictures WOODARD would have taken himself depicting his own sexual abuse of children. WOODARD replied, "I might but I had to get rid of a bulk of then recently."[7] WOODARD went on to explain, "Yes an unfortunate incident of my mother not telling me she was using my room back home as a guest room while i was out at school." The chat progressed to discuss WOODARD's family. WOODARD admitted to having an older sister and a younger half-sibling that he "almost never see." When asked by the UC if he had ever had, "Any luck with either", WOODARD responded, "No my older sister was to prudish to find a way in and I've never been alone with my younger sister." WOODARD then sent the UC pictures of his siblings. During his post-arrest interview, WOODARD admitted that he had taken pictures off of his older sister's Instagram to send to the UC. He stated that he had taken a picture from a family friend's Facebook page, depicting a prepubescent little girl dressed in a yellow dress, and sent it to the UC pretending that it was his younger half-sibling.

---

[7] All text is reproduced as it was displayed in the original chats, and may contain spelling and typographical errors.

As the chat ensued, WOODARD stated that he was available to meet on Thursday October 24, 2019 during the day. The UC requested that WOODARD send a picture of himself so that they would be able to recognize each other when they met in person. The UC suggested that WOODARD take a picture of himself, holding up 2 fingers near his face. WOODARD complied and sent an image of himself holding up 2 fingers near his face. Later in the chat WOODARD informed the UC that he was going to have to postpone their meeting due to a situation involving one of his friends.

The UC had no further contact with WOODARD until October 31, 2019, at 4:27p.m. WOODARD sent a message to the UC which read, "Hey sorry I haven't messaged in a while." The UC responded on November 1, 2019, and a text exchange ensued. During the course of these communications, WOODARD stated, "Did you wanna try to meet up again next week or Did I blow it lol". The following is a portion of the text exchange:

> UC: Lol we can try for sure. Let me know what works.
>
> WOODARD: Well Im a college student so I can get a little busy but Thursday is the least busy day for me typically.
>
> UC: If I get the hotel and drive her. Ill need a little something for this. Thursday should work. Even like 15 or 20 for gas via cash app would be good.
>
> WOODARD: I can give you gas money ill also need to be picked up from my university though.
>
> UC: Ok cool
>
> WOODARD: I don't have cash app does PayPal work?

As the text exchange continued, the UC and Woodard discussed the logistics for their planned meeting, and, on November 1, 2019, WOODARD sent the UC fifteen dollars via PayPal to the

6

UC's email account for the purpose of covering the cost of gas for the UC's trip from D.C. to Baltimore, Maryland.

Over the next few days, the UC and WOODARD continued to communicate. The following is a portion of the chat that occurred on November 7, 2019:

> WOODARD: Did you tell her about the "trip" she's going on?
>
> UC: Ok cool, yes I did she is totally cool with it. I told her you're a friend I met and really nice.
>
> WOODARD: Does she know what we'll be doing?
>
> UC: Yes
>
> WOODARD: Ok nice, any particular plans on what we'll do to her?
>
> UC: Im open to what u want to do I know you mentioned her sucking your cock. Anything else.
>
> WOODARD: I would think it'd be hot if we double facial her, like bukkake and ask her to eat it up, I might bring some candy or something to reward her lol.
>
> UC: Mmmmmmmm yes I love that idea!

The UC continued to communicate with WOODARD on November 7-8, 2019. During the course of the text communication WOODARD asked the UC if he would bring make up for his daughter to wear, writing, "let her try some big girl make up lol." WOODARD told the UC to meet him on his college campus located at 1000 Hilltop Circle, Baltimore County and instructed the UC to pick him up at the Retrievers Activity Center ("RAC") parking lot.

On the morning of their proposed meeting, on November 14, 2019, WOODARD again instructed the UC to meet him by the RAC building, and to stay in the car. He asked the UC what type of car he was driving, and confirmed that the 8-year-old child would be in the vehicle.

7

WOODARD asked the UC, "Is she nervous?" The UC responded, "She is excited and a little nervous so am I lol." WOODARD asked, "Lol same she's excited to have sex?" WOODARD informed the UC that he would be "wearing a flat cap" and that he was at the agreed upon meeting location. As the UC pulled into a circle at the Activity Center parking lot, WOODARD began walking towards the UC's car. He was placed under arrest and transported to the police station at the UMBC campus.

Once at the police station, WOODARD was read his *Miranda* warnings and agreed to speak with law enforcement. During this interview, WOODARD admitted to utilizing the social networking app described above in order to "mess with people." He indicated that the search terms that he used to connect with other individuals included the word pervert. According to WOODARD, he was only utilizing this social media application in order to "trick people into meeting him, so he could call the police." Unfortunately, WOODARD's assertion that he was trying to assist law enforcement in the apprehension of dangerous pedophiles is flatly contradicted by the rest of his statement, as well as all by the other evidence collected during this investigation. WOODARD admitted that his Kik user name was "aphidethan" and that his display name was "Salty Cornflakes" – the same username and display name that distributed the links containing hundreds of images and videos depicting the graphic sexual assault of young children to the UC. He further admitted to receiving about 5 or 6 links containing child pornography from different people, as well as to distributing these links to at least two other individuals besides the UC. WOODARD admitted to chatting using an application known as Wickr.[8] He stated that he used Wickr in order to discuss

---

[8] Wickr provides users the ability to exchange voice and video chats, which are all end-to-end encrypted. Wickr informs prospective customers that it allows users to share files, videos, and photos securely. By promising "security", Wickr boasts that each message has a new encryption

sexual interest in children with other individuals. When questioned by law enforcement, WOODARD volunteered that they wouldn't be able to see any of these conversations on his phone because, "Wickr automatically deletes all communications." Presumably, if WOODARD was only engaging in this type of behavior to assist law enforcement, he would want to ensure that the incriminating evidence was well-preserved, rather than automatically deleted. WOODARD admitted that he had never actually turned anyone into law enforcement, despite acknowledging that receiving and distributing child pornography was illegal. He also admitted to searching for child pornography on the "dark web" and to viewing images and videos depicting children between the ages of 9-17 engaging in sexual activity with adults.

Following his arrest, WOODARD consented to the seizure and forensic search of his cellular telephone and laptop. The forensic analysis is ongoing at this time. However, thumbnails depicting prepubescent children in various states of undress and engaging in sexually explicit conduct have been discovered on WOODARD's cellular phone. Additionally, there is a video on WOODARD's cellular phone with a modification date of September 6, 2017.[9] This video is over eight minutes in length and depicts a prepubescent girl engaging in various sexual acts with an adult male, to include oral sex and masturbation.

---

key that is deleted as soon as the message is decrypted, and that all user content is forensically wiped form the device after it expires.

[9] Based on the investigation, to date, it is believed that WOODARD was residing with his mother in September of 2017.

## **APPLICABLE LEGAL STANDARD**

The Bail Reform Act permits a judicial officer to hold an individual without bond pending trial if the officer finds clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Pursuant to 18 U.S.C. § 3142(f)(1)(A), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence. A crime of violence is defined to include "any felony under chapter….110." 18 U.S.C. § 3156(a)(4)(C).

The Distribution of Child Pornography is a felony under chapter 110 and is, therefore, a crime of violence.  Furthermore, it is also an offense involving a minor victim under section 2252(a)(2) and thus, under 18 U.S.C. § 3142(e)(3)(E), creates a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"); *see also United States v. Hir,* 517 F.3d 1081, 1086 (9th Cir. 2008).  Even if the defendant does not pose a flight risk, danger to the community by itself is sufficient reason to order pretrial detention.  *United States v. Salerno*, 481 U.S. 739, 755 (1987).

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in §

3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## **ANALYSIS**

For the reasons that follow, the government submits that that the defendant cannot rebut the presumption that he shall remain detained, as there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community.

### A.    **Nature and Circumstances of the Charged Offense**

This factor clearly favors detention, since the Defendant's criminal conduct is egregious.  On October 18, 2019, the Defendant distributed child pornography by sending links containing hundreds of images and videos depicting children being sexually assaulted by adult men.  Each one of the children depicted in these images and videos was traumatized and victimized in the worst way imaginable at the time the images were created, and they are re-victimized and re-traumatized each and every time an individual, like the Defendant, views the images for their own sexual gratification. As recently explained by the Sixth Circuit in a child pornography case:

> ...we have numerous victims in a case like this, not one victim. Every image of a child, every image of a non-adult engaged in any type of sexual activity or any type of pose without clothing or any type of exploitation constitutes an additional case of victimizing a child. Without a demand for that type of information and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography, there is going to be an unending stream of child abuse of…children who are forced into these roles.

> ...every image has a child who has been exploited and abused, and that is the concern I have. It is the concern that I have when people are engaged in serially doing this, the effect it has on children throughout the world and the effect it has on their future lives.

*See United States v. Miller*, 665 F.3d 114, 121-122 (6th Cir. 2011)(quoting the district court) (rejecting an attack on the child pornography sentencing guidelines and highlighting the grave harm caused to the victims depicted in child pornography images and the evidence that traffickers and possessors of child pornography are the impetus for the creation of more sexual abuse of minors).

The Defendant didn't simply possess and view these images and videos. The Defendant sent them to an individual he believed to be a pedophile who was actively sexually assaulting an 8-year-old child. The Defendant, by his own admission, has further disseminated these images not only to the UC, but to at least two other individuals, as well. Beyond that, this Defendant has made statements suggesting that he has actively abused a 9-year-old little girl, and that he has, at one time, created child pornography.

A clearly aggravating factor present in this case is the fact that, for nearly a month, this Defendant repeatedly communicated with an individual who he believed was actively abusing his 8-year-old daughter. He discussed in great detail the ways in which he wanted to sexually abuse this child; found a local motel hotel in which to commit these heinous acts; and paid the UC money for gas in order to ensure that he would have access to the child. There is simply no way to overstate the serious nature of the Defendant's criminal conduct. As such, the Defendant should be detained pending trial.

### B. The Weight of the Evidence Against the Defendant

As summarized above, the evidence against the Defendant is overwhelming. The Defendant's communications with the UC, using Kik as well as text messages, have been preserved. The content of these communications clearly illustrate the Defendant's intent. Beyond that, in a post-*Miranda* statement, the Defendant admitted to receiving and distributing child pornography. The forensic analysis, which is ongoing, is likely to continue to provide additional corroborative evidence. Therefore, the weight of the evidence strongly favors detention.

### C. The History and Characteristics of the Defendant

The Government acknowledges that the Defendant has no criminal history. However, the fact that the Defendant has no criminal history – nor record of arrests- does not mean that he has not engaged in prior criminal conduct, particularly in offenses involving not only the online exploitation of children, but the hands-on sexual abuse of children. First, as noted above, the Defendant has made statements regarding his prior sexual contact with children. However, even without such statements, the Defendant's criminal conduct, the distribution and receipt of child pornography, as well as his detailed and persistent efforts to meet a child for sexual activity, are crimes that are committed in secret. This secrecy, combined with the overwhelming presence of digital devices and the near universal access to the internet, makes detection of these criminal offenses difficult. For example, in the present case, the forensic analysis demonstrates that the Defendant was accessing, viewing and possessing child pornography for over two years before he was encountered by undercover law enforcement in a social media application. Furthermore, the mere lack of an arrest record's significance should be called into question in cases involving the sexual exploitation and abuse of children, because it is well-known that children often do not

disclose sexual abuse. *See* K. London, M. Bruck, S. J. Ceci & D. W. Shuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways Children Tell?*, 11 PSYCHOLOGY, PUB. POL'Y & L. 1, 194-226 (American Psychological Association, 2005)(finding in a study of adult retrospective victim studies about child sex abuse, approximately 60 – 70% of adults sexually abused as children did not recall disclosing the abuse during childhood); *See also* D. W. Smith, E. J. Letourneau, B. E. Saunders, D. G. Kilkpatrick, H. S. Resnick & C. L. Best, *Delay in Disclosure of Childhood Rape: Results from a National Survey*, 24 CHILD ABUSE & NEGLECT 2, 273-87 (2000)(the results of the study found that only 12% of child rape victims' assaults were reported to law enforcement authorities.). As such, the fact that the Defendant lacks a criminal record, given the ways in which these types of crimes are committed and the reluctance and inability of the victims to disclose, should be given less weight.

Furthermore, as detailed above, the Defendant's conduct did not constitute a one-time lapse in judgement. Rather, it is clear that the Defendant has been engaging in the online sexual exploitation of children, including searching for, and downloading, child pornography, for at least two years. He has now been suspended from college, and it is unclear what the impact his recent arrest will have on his employment. Therefore, despite a lack of criminal history, and apparent community ties, the Defendant should be detained pending trial.

### D. The Nature and Seriousness of the Danger to Any Person or the Community

The evidence here establishes that the defendant represents a grave danger to the community. As mentioned above, the receipt and distribution of child pornography presents a serious danger to the community, which results in severe mental, emotional, and physical trauma to the countless victims depicted in the images the Defendant actively traded with other individuals he knew had a sexual interest in children. The Defendant, as a consumer of this

material, furthers the demand for new material depicting the graphic, sexual exploitation and abuse of defenseless children. It is this type of harm that led Congress to create the statutory presumption of detention in these cases.

That child pornography offenses are serious is a fact noted by the Supreme Court. At least as early as the landmark decision, New York v. Ferber, 458 U.S. 747 (1982), the Supreme Court referenced numerous research materials detailing the harm to children as a result of the production and trafficking of child pornography.

> "[P]ornography poses an even greater threat to the child victim than does sexual abuse or prostitution. Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography."

Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L.Rev. 535, 545 (1981). *See also* Child Exploitation 292 ("[I]t is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotional repercussions"); Note, Protection of Children from Use in Pornography: Toward Constitutional and Enforceable Legislation, 12 U.Mich.J. Law Reform 295, 301(1979)(interview with child psychiatrist) ("The victim's knowledge of publication of the visual material increases the emotional and psychic harm suffered by the child"). 458 U.S. 758, n.9.

Moreover, as the Eastern District of New York has found:

> ...the issue is not only defendant's potential abuse of children and his interaction with children if on bail, but also his ability, if he is released on bail, to attempt to possess additional child pornography, or to communicate and interact with (via email, internet, or phone) others involved in the possession, sale, and distribution of child pornography or other sexual abuse of children, which would also create a clear danger by facilitating the criminal and dangerous exploitation of children by other individuals.

*United States v. Reiner*, 468 F.Supp.2d 393, 397 (E.D.N.Y. 2006).  The *Reiner* court further found that there were no conditions in that case that could reasonably assure the safety of the community "[i]n this day and age, with devices such as cellphones, Blackberries, and laptops..." Id. at 399; *see also United States v. Blankenship*, 2008 WL 1925137 (S.D.W.Va. April 29, 2008) (S.D.W.Va. April 29, 2008)(unpublished)(noting the ease of accessing the internet by means of various devices and stating "[t]he Court finds that the evidence clearly and convincingly establishes that, confined to his home and electronically monitored, Defendant would not be prevented from obtaining the means to access the internet and attempting again to obtain child pornography and in this poses a danger to children and the community"); *United States v. Doyle,* 2007 WL 1097844, *1 (W.D.Va. 2007)(finding danger of future offenses "especially considering that pornographic images of children are widely available on the internet and can be easily accessed by a personal computer"), conviction rev'd on other grounds, 650 F.3d 460 (2011).

While the Defendant's charged criminal conduct, the distribution of child pornography, constitutes a crime of violence in and of itself, the Defendant's other actions emphasize that he has been, and continues to be, a danger to some of the most vulnerable members of our community:  children.  As detailed above, during the course of the chats with the UC officer, the Defendant detailed how he tricked a 9-year-old child in his previous neighborhood into performing oral sex on him by covering his penis with chocolate syrup.  Additionally, his messages suggest that he has produced child pornography in the past, because he informed the UC that he had "homemade pics", but that he had to get rid of them because his mother was using his room in her house as a guest room.  This Defendant also took a Facebook picture of a young girl, presumably without the permission of her parents or the individual who posted it, and sent it to a person he believed was sexually abusing a child of a similar age.  Furthermore, and

17

most concerning, the Defendant went to great lengths in order to meet an individual that be believed shared a sexual interest in prepubescent children, and who had access to a young child, for the purpose of engaging in a serious of sex acts with this little girl in a Motel 6.  For these reasons, it is clear that the Defendant poses a significant danger to the community and, given this risks, there are no condition or combination of conditions that will reasonable keep the community safe if the Defendant is released.  As such, this factor weighs heavily in favor of detention.

## **CONCLUSION**

For all of the reasons set forth above, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the Defendant should be detained pending trial.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY

\_\_/s/_____
Amy E. Larson
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W.,
Washington, D.C. 20530
202-252-7863
Amy.Larson2@usdoj.gov